UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IN RE: AIR CRASH NEAR CLARENCE CENTER,
NEW YORK, ON FEBRUARY 12, 2009,

**DECISION AND ORDER**
09-md-2085

This document relates to:
09-CV-1039S
09-CV-1040S
09-CV-1041S
09-CV-1042S
09-CV-1087S

## I.  INTRODUCTION

On February 12, 2009, Continental Connection Flight 3407 crashed on approach to the Buffalo Niagara International Airport, killing all 49 people aboard and one person on the ground.  All federal litigation related to the crash has been transferred by the United States Judicial Panel on Multidistrict Litigation to the Western District of New York for coordinated or consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407.  (Docket No. 1.[1])

Presently before this Court are Motions to Remand filed by the plaintiffs in five lawsuits that the defendants removed from the New York State Supreme Court, County of Erie.  Plaintiffs contend that remand is required because federal jurisdiction is nonexistent.  Plaintiffs also seek costs and attorney fees.  For the following reasons, Plaintiffs' Motions to Remand will be granted and their request for attorney fees and costs will be denied.

---

[1] Unless otherwise noted, all docket references are to the master multidistrict litigation docket — 09-md-2085.

## II. BACKGROUND

In November 2009, Plaintiffs filed their respective complaints in the New York Supreme Court, County of Erie, against Defendants Colgan Air, Inc., Pinnacle Airlines Corp., Continental Airlines, Inc., and FlightSafety International, Inc. ("FlightSafety"). The complaints are substantially similar to one another: each asserts negligence claims against Colgan, Pinnacle, and Continental (Johnston Complaint, ¶¶ 42-48[2]); negligent performance of a contractual duty, third-party beneficiary breach of contract, and negligence claims against FlightSafety (Johnston Complaint, ¶¶ 49-66); and wrongful death and conscious pain and suffering/pre-impact terror claims against all defendants (Johnston Complaint, ¶¶ 67-72).

Most pertinent here are the allegations against FlightSafety, which is a New York corporation with its principal place of business in New York. (Johnston Complaint, ¶ 8.) Plaintiffs allege that FlightSafety trained (or failed to train) the captain of the aircraft, Marvin Renslow, and the first officer, Rebecca Lynne Shaw, pursuant to a training agreement with Colgan, Pinnacle, and/or Continental. (Johnston Complaint, ¶¶ 13, 33, 35.)

Plaintiffs allege that FlightSafety was responsible for providing the necessary flight simulator training to qualify Renslow as a captain on the aircraft at issue — a Bombardier Dash 8-Q400 — and that Renslow was trained in November 2008 in St. Louis, MO, using FlightSafety's Dash 8-Q400 simulator. (Johnston Complaint, ¶¶ 33, 34, 62.)

Plaintiffs further allege that FlightSafety was responsible for providing the necessary

---

[2]The parties cite the complaint filed in <u>Kathleen Johnston v. Colgan, et al.</u>, 09-CV-1042S, as illustrative of the five complaints. This Court will therefore do the same. The Johnston complaint is attached to the Notice of Removal, Docket No. 1, in 09-CV-1042S.

ground and transition flight simulator training to qualify Shaw as a first officer and that Shaw completed the "First Officer Dash 8-Q400 Initial/Transition Course" at FlightSafety's Toronto Learning Center.  (Johnston Complaint, ¶¶ 35, 36, 61.)

The thrust of Plaintiffs' claims against FlightSafety is that its training of Renslow and Shaw was improper, insufficient, and substandard, and caused Renslow and Shaw to not recognize ice-related aerodynamic conditions present at the time of the crash.  (Johnston Complaint, ¶ 28.)  This caused a decrease in airspeed to a near stall, which activated the aircraft's anti-stall system and caused the aircraft to pitch nose down and the autopilot to disconnect.  (Johnston Complaint, ¶ 29.)  Plaintiffs allege that in reaction to this situation, the aircraft experienced a "pilot-induced pitch up to a deck angle of 30 degrees or more above the horizontal." (Johnston Complaint, ¶ 30.)  This reaction, in turn, allegedly caused a loss of airspeed and lift, which resulted in a full aerodynamic stall and loss of flight control.  (Johnston Complaint, ¶ 30.)  Plaintiffs allege that the aircraft then rolled up on its right wing to a near inverted and steep nose-down condition, from which it never recovered. (Johnston Complaint, ¶ 31.)

Plaintiffs allege that FlightSafety never instructed Renslow and Shaw on how to use the stick-pusher mechanism in the Dash 8-Q400, and in addition, trained them using simulators and equipment that did not accurately represent the performance of a Dash 8-Q400.  (Johnston Complaint, ¶¶ 38, 39.)  Plaintiffs further contend that "tremendous financial pressure" at FlightSafety resulted in it providing substandard flight and simulator training, such that key aircraft components, like the stick-pusher mechanism in the Dash 8-Q400, were not adequately or accurately represented by flight simulation and training devices, and thus not adequately explained or taught.  (Johnston Complaint, ¶ 40.)

In their claim against FlightSafety for negligent performance of a contractual duty, Plaintiffs allege that the passengers of Continental Connection Flight 3407 relied on FlightSafety's performance of its contractual obligations to Colgan, Pinnacle, and/or Continental, but that FlightSafety negligently performed the flight training it was obligated to provide. (Johnston Complaint, ¶¶ 50, 52.) Plaintiffs also allege that FlightSafety's negligent performance created or increased a risk of harm to others, created or exacerbated a dangerous condition, and launched a force and/or instrument of harm that proximately caused the fatal aircrash. (Johnston Complaint, ¶¶ 51, 53.)

In their third-party beneficiary breach of contract claim against FlightSafety, Plaintiffs allege that the passengers aboard Continental Connection Flight 3407 were direct or intended third-party beneficiaries of the training or other contracts that FlightSafety breached. (Johnston Complaint, ¶ 56.)

In their negligence claim against FlightSafety, Plaintiffs allege that FlightSafety's "negligence, careless acts and omissions, wrongful acts and omissions, wanton and willful acts and omissions, and recklessness and dereliction of duty . . . in instructing and training" Renslow and Shaw proximately caused the aircraft. (Johnston Complaint, ¶¶ 64, 65.)

### III. DISCUSSION

**A.    Defendants' Removal and Plaintiffs' Motion for Remand**

A civil action brought in state court may be removed by a defendant to a federal district court of original jurisdiction. 28 U.S.C. § 1441. District courts have original jurisdiction over all civil actions arising under the Constitution, treaties, or laws of the United States, and over all civil actions between citizens of different states, if the amount in

controversy exceeds $75,000. 28 U.S.C. §§ 1331, 1332(a)(1).

Out of respect for states' rights and in keeping with the limited jurisdiction of federal courts, removal jurisdiction is "strictly construed," with all doubts resolved against removal. Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 32, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002); In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig., 488 F.3d 112, 124 (2d Cir. 2007). And the removing party bears the burden of establishing proper jurisdiction. United Food & Commercial Workers Union v. Centermark Props. Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994); Funeral Fin. Sys., Ltd. v. Solex Express, Inc., No. 01-CV-6079(JG), 2002 WL 598530, at *3 (E.D.N.Y. Apr. 11, 2002) (noting that in the face of a motion to remand, the burden falls on the defendant to prove the existence of jurisdiction and that the case is properly in federal court).

Defendants removed these actions on the basis of federal jurisdiction under 28 U.S.C. §§ 1331 and 1332(a)(1). They maintain that FlightSafety's New York citizenship does not destroy diversity under the doctrine of fraudulent joinder, and that federal-question jurisdiction exists because otherwise applicable state law has been preempted by federal law.

In their Motion to Remand, Plaintiffs challenge Defendants' jurisdictional assertions and insist that remand to state court is required. They argue that this Court lacks diversity jurisdiction because FlightSafety is a citizen of New York and was not fraudulently joined, and lacks federal-question jurisdiction because federal law does not preempt their state law causes of action.

**B.     Diversity Jurisdiction**

Assuming that the amount-in-controversy requirement is met, jurisdiction is proper

under 28 U.S.C. § 1332 (a) only when all adverse parties to the litigation are citizens of different states. See Herrick Co. v. SCS Commc'ns, Inc., 251 F.3d 315, 322 (2d Cir. 2001). When a corporation is involved, it is deemed "a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). A corporation's principal place of business is its "nerve center" — "the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." Hertz Corp. v. Friend, __ U.S. __, 130 S.Ct. 1181, 1186, __ L.Ed.2d __ (2010).

Here, on the face of Plaintiffs' complaints, complete diversity does not exist. Colgan is a citizen of Virginia; Pinnacle is a citizen of Delaware and Tennessee; and Continental is a citizen of Delaware and Texas. (Johnston Complaint, ¶¶ 2, 4, 6.) But Plaintiffs and FlightSafety are citizens of New York.[3] (Johnston Complaint, ¶¶ 1, 8.) Nonetheless, Defendants maintain that diversity jurisdiction exists because Plaintiffs fraudulently joined FlightSafety solely to destroy diversity. As such, Defendants argue, FlightSafety's citizenship should be disregarded for purposes of determining diversity jurisdiction.

### 1.    Fraudulent Joinder

The fraudulent joinder doctrine prevents plaintiffs from defeating diversity jurisdiction and a defendant's right of removal by simply joining as defendants non-diverse parties with no real connection to the controversy. See Pampillonia v. RJR Nabisco, Inc. 138 F.3d 459, 460-61 (2d Cir. 1998). To establish fraudulent joinder, a defendant must demonstrate, by clear and convincing evidence, that either (1) the plaintiff committed fraud in the pleadings,

---

[3]It is assumed for purposes of this motion that the five decedents were citizens of New York at the time of their deaths. See 28 U.S.C. § 1332(c)(2) ("the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent").

or (2) there is no possibility, based on the pleadings, that the plaintiffs can state a cause of action against the non-diverse party in state court.  Id. at 461.

This is a heavy burden because all factual and legal issues are resolved in the plaintiff's favor, and the plaintiff's chances of recovery on a state claim need only be possible: "Any possibility of recovery, even if slim, militates against a finding of fraudulent joinder; only where there is 'no possibility' of recovery is such a finding warranted." Namazee v. Premier, Inc., 232 F. Supp. 2d 172, 178 (S.D.N.Y. 2002) (citing Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 207 (2d Cir. 2001)); Pampillonia, 138 F.3d at 461.

Moreover, "[b]ecause this jurisdictional inquiry is preliminary to any decision on the merits, the federal court resolves any uncertainties in applicable state law in plaintiffs' favor and subjects the complaint to less searching scrutiny than on a motion to dismiss for failure to state a claim."  Intershoe Inc. v. Filanto S.P.A., 97 F. Supp. 2d 471, 474 (S.D.N.Y. 2000) (citations omitted); see also Gensler v. Sanolfi-Aventis, No. CV-08-2255, 2009 WL 857991, at *2 (E.D.N.Y. Mar. 30, 2009) ("Though New York law is unclear in some relevant respects, these doubts must be resolved in plaintiff's favor."); Kuperstein v. Hoffman-Laroche, Inc., 457 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) ("If even one of the plaintiff's claims against a non-diverse defendant can survive, the action must be remanded."); Ecology & Env't, Inc. v. Automated Compliance Sys. Inc., No. 00-CV-887E, 2001 WL 1117160, at *5 (W.D.N.Y. Sept. 4, 2001) (finding that the court must only determine whether the complaint "colorably asserts such a [state] claim and that New York's liberal pleading rules leave open the possibility that the state court would deem the Complaint to state a claim").

### a.     FlightSafety as a Proper Party

Defendants do not allege that Plaintiffs committed fraud in the pleadings.  Rather, they contend that Plaintiffs cannot state a cause of action against FlightSafety in state court.  Relying first on the February 19, 2010 affidavit of Patrick Coulter, Defendants argue that as to the claims involving Shaw, FlightSafety is not a proper party because a separate entity — FlightSafety Canada Ltd. — trained Shaw.  (Affidavit of Patrick Coulter, Docket No. 240, ¶¶ 5, 7.)  This assertion, however, directly contradicts a pre-suit affidavit dated April 2, 2009, wherein Coulter indicated that FlightSafety owned the Toronto Learning Center.  For example, Coulter identified himself as "the Center Manager for FlightSafety International Inc.'s Toronto Learning Center" and identified the Toronto Learning Center where Shaw was trained as "FlightSafety International Inc.'s Toronto Learning Center." (Affidavit of Patrick Coulter, Docket No. 191, Exhibit A, ¶¶ 2, 3, 5.)

Defendants' only explanation for the contradictions in Coulter's two affidavits is that he was mistaken in his April 2, 2009 affidavit.  (Affidavit of Patrick Coulter, Docket No. 240, ¶ 8.)   But other evidence submitted by Plaintiffs, including FlightSafety's internal documents and filings with the Securities and Exchange Commission, suggest that the Toronto Learning Center is FlightSafety's.  (See, e.g., Docket No. 191, Exhibits K, B, C, J.) At the very the least, this evidence raises an issue of fact, which this Court is obligated to resolve in Plaintiffs' favor at this stage.[4]  See Pampillonia, 138 F.3d at 461 (holding that all

---

[4]Although not asserted or argued at length, Defendants appear to also contend that FlightSafety did not actually train Renslow, but that he was trained at FlightSafety's facilities by Colgan employees. (Notice of Removal, Docket No. 1, 09-CV-1042, ¶¶ 15, 16, 19.)  Plaintiffs allege, however, that FlightSafety trained Renslow, and it appears undisputed that Renslow received training at FlightSafety's facilities using FlightSafety's equipment.  (Johnston Complaint, ¶¶ 33, 34, 62.)  This is sufficient to raise an issue of fact at this stage, which must be resolved in Plaintiff's favor.

factual and legal issues must be resolved in the plaintiff's favor when assessing fraudulent joinder). Accordingly, it is presumed that FlightSafety trained Renslow and Shaw as alleged.

### b. New York's Bar of Educational Malpractice Claims

Defendants next argue that because Plaintiffs challenge FlightSafety's training of Renslow and Shaw, particularly in their negligence cause of action, they essentially assert educational malpractice claims, which are not cognizable under New York law. Defendants rely on a series of New York cases holding that educational malpractice claims are barred on public policy grounds.

In <u>Donohue v. Copiague Union Free School District</u>, the plaintiff sued a public school district, claiming that it failed in its duty to educate him. 47 N.Y.2d 440, 442 (1979). The plaintiff alleged that the school district graduated him even though he lacked even basic abilities to comprehend written English. <u>Id.</u> In assessing what it described as the plaintiff's "educational malpractice" claim, the Court of Appeals of New York held that public policy considerations counseled against the courts entertaining such claims. <u>Id.</u> at 444. The court explained its rationale as follows:

> To entertain a cause of action for "educational malpractice" would require the courts not merely to make judgments as to the validity of broad educational policies — a course we have unalteringly eschewed in the past — but, more importantly, to sit in review of the day-to-day implementation of these policies. Recognition in the courts of this cause of action would constitute blatant interference with the responsibility for the administration of the public school system lodged by Constitution and statute in school administrative agencies.

<u>Id.</u> at 444-45.

Following <u>Donohue</u>, the Court of Appeals decided <u>Hoffman v. Board of Education</u>

of City of New York, wherein it applied the educational malpractice bar to preclude recovery against a school district for failing to properly evaluate the intellectual capacity of a student. 49 N.Y.2d 121, 123 (1979). The court rejected the plaintiff's claim as an attack upon the professional judgment of the board of education and thus foreclosed by Donohue. Id. at 125, 126. In so doing, the court reiterated its directive that courts in New York "may not substitute their judgment, or the judgment of a jury, for the professional judgment of educators and government officials actually engaged in the complex and often delicate process of educating the many thousands of children in our schools." Id. at 125-26.

Some five years later, the court again applied the educational malpractice bar in rejecting a plaintiff's claim that his legal guardians failed to ensure that he received an appropriate education. In Torres v. Little Flower Children's Services, the plaintiff argued that his claim was not an impermissible educational malpractice claim, because it was lodged against his guardians, not a school district. 64 N.Y.2d 119, 126 (1984). In rejecting this argument, the court explained that it is not the identity of the defendant that determines whether a claim is for educational malpractice, but rather, the nature of the determinations the court would be called upon to make. Id. at 126. It characterized its decisions in Hoffman and Donohue as "holding that as a matter of public policy the courts would not second-guess the professional judgments of public school educators and administrators in selecting programs for particular students." Id. at 123.

New York's educational malpractice bar has also been extended to private schools. See, e.g., Paladino v. Adelphi Univ., 89 A.D.2d 85 (2d Dep't 1982) (private elementary school); Andre v. Pace Univ., 655 N.Y.S.2d 777 (2d Dep't 1996) (private university). In Paladino v. Adelphi University, the Second Department found that Donohue's reasoning

10

applied equally in the private school context, noting the heavy regulatory scheme that New York imposes on private educational institutions. 89 A.D.2d at 89-90. Recognizing that public and private schools are similarly situated in their mandates to educate children, the court held that "[d]espite the absence of a constitutional or statutory predicate, the reluctance on the part of the judicial branch to interfere with the educational policies adopted for public schools should be equally applicable to private institutions." Id. at 91.

Defendants argue that New York's educational malpractice jurisprudence encompasses (and therefore bars) the claims that Plaintiffs allege in this case. But the specific policy considerations underlying New York's educational malpractice decisions are not present here to such a degree that this Court can definitively conclude that Plaintiffs have no chance of successfully asserting their claims. Thus, mindful that the demand on Defendants is to demonstrate that Plaintiffs have 'no possibility' of succeeding in New York state court, this Court finds that they have failed to meet that difficult burden.[5] See Whitaker, 261 F.3d at 207; Pampillonia, 138 F.3d at 461.

First, the New York decisions in this area involve traditional educational institutions — public and private schools and universities. This case, however, presents a private corporation engaged in the business of providing specialized training, thus a New York court may reasonably determine that it is not being tasked with assessing "the validity of broad educational policies," as discussed in Donohue. 47 N.Y. at 445.

Second, a New York court may find that the commercial, specialized training of

---

[5] Because the issue is whether Plaintiffs could possibly succeed on their claims under New York law in state court, the cases cited by Defendants from outside of New York are not particularly instructive. See Sheesley v. Cessna Aircraft Co., Nos. Civ. 02-4185, et al., 2006 WL 1084103 (D.S.D. 2006); Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc., 277 S.W.3d 696 (Mo. Ct. App. 2008); Moss Rehab v. White, 692 A.2d 902, 909 (Del. 1997); Moore v. Vanderloo, 386 N.W.2d 108, 113-15 (Iowa 1986).

airmen is not necessarily akin to the general education of children, and is unlikely to result in a glut of suits challenging the day-to-day implementation of educational policies. Id. Defendants cite no cases — and this Court has discovered none — in which a New York court has foreclosed a cause of action challenging narrow, specialized training provided to adults by a commercial institution that's business is limited to such narrow, specialized training, whether the claim is brought directly or by a third party. It therefore cannot be concluded as a matter of law that Plaintiffs' state claims would fail.

Third, a New York court could reasonably find that the specialized training at issue in this case does not implicate the same policy considerations present in the traditional educational setting. For one, the state is not directly involved in, nor does it regulate, commercial training to the degree it does general education. See Paladino, 89 A.D.2d at 89-92 (applying educational malpractice bar to private school, in part, because of the state's heavy regulation of general education). In addition, the New York Court of Appeals' concern that recognition of an educational malpractice claim would necessarily interfere in the constitutional and statutory duties of state administrative agencies to administer the public school system is obviously not present here, where the training is provided commercially. See Donohue, 47 N.Y.2d at 445. In the absence of this primary concern, it is possible that a New York court could find that Plaintiffs' claims fall outside the breadth of New York's educational malpractice bar. Since the application of New York law to this set of facts is not certain or clear, the doubt must be resolved in Plaintiffs' favor. See Gensler, 2009 WL 857991, at *2; Intershoe, 97 F. Supp. 2d at 474.

Fourth, the New York Court of Appeals has explicitly stated that a cause of action resembling educational malpractice could possibly be pled within the strictures of a

traditional negligence or malpractice action. <u>Donohue</u>, 47 N.Y. at 443. This may be especially so if Plaintiffs can convince a New York court that the public policy considerations underlying the educational malpractice bar do not apply in this context. The court noted the possibility that a workable standard could be developed, proximate cause proven, and injury established. <u>Id.</u> Successful pleading is, of course, the first stage of asserting a claim. And although the court rejected the nature of the claim before it in <u>Donohue</u>, this Court cannot conclude with certainty that Plaintiffs would be unable to materially distinguish their claims from those in which the educational malpractice bar has been applied.

Accordingly, for these reasons, this Court finds that the educational malpractice bar does not necessarily prevent Plaintiffs from maintaining their causes of action in state court.

### c.   Plaintiffs' State Law Claims

Finally, Defendants argue that there is no possibility that Plaintiffs can maintain state law causes of action against FlightSafety. Again, this Court's task at this stage is limited to determining whether Plaintiffs' complaints "colorably assert" claims that the state court might possibly recognize. <u>See</u> <u>Ecology & Env't</u>, 2001 WL 1117160, at *5. And as noted above, the existence of just one colorable state claim defeats diversity jurisdiction because "a defendant cannot remove a case that contains some claims against 'diverse' defendants as long as there is one claim brought against a 'nondiverse' defendant." <u>Wis. Dep't of Corrs. v. Schacht</u>, 524 U.S. 381, 388, 118 S.Ct. 2047, 2052, 141 L.Ed.2d 364 (1998) (citing <u>Caterpillar Inc. v. Lewis</u>, 519 U.S. 61, 68-69, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996)); <u>see also</u> <u>Kuperstein</u>, 457 F. Supp. 2d at 470 ("If even one of the plaintiff's claims against a non-

diverse defendant can survive, the action must be remanded.") With little difficulty, this Court finds that Plaintiffs can assert at least one state claim against FlightSafety.

Plaintiffs' first claim against FlightSafety is for negligent performance of a contractual duty. (Johnston Complaint, ¶¶ 49-54.) Under New York law, a contractual obligation, standing alone, does not give rise to tort liability in favor of a non-contracting third party. See Ragone v. Spring Scaffolding, Inc., 46 A.D.3d 652, 654 (2d Dep't 2007). An exception exists, however, "where the contracting party, in failing to exercise reasonable care in the performance of his duties, 'launche[s] a force or instrument of harm'."[6] Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 140 (2002)(quoting H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 168 (1928)). Thus, liability has extended to third parties in situations where a contracting party erected an elevated bridge with a raised plank, see Ragone, 46 A.D.3d at 654, plowed snow, see Elsey v. Clark Trading Corp., 57 A.D.3d 1330, 1332 (3d Dep't 2008), provided repair advice, see Roosevelt, 15 A.D.3d at 937, and repaired a truck liftgate, see Naz v. Christian Eckhoff Truck Bodies, Inc., 66 A.D.3d 747 (2d Dep't 2009). Suffice it to say that this exception is well entrenched in New York law.

Here, Plaintiffs allege that FlightSafety contracted with Colgan, Pinnacle, and/or Continental, to train Renslow and Shaw on the operation of a Bombardier Dash 8-Q400, and that the passengers of Flight 3407 relied on FlightSafety's performance. (Johnston Complaint, ¶¶ 33, 35, 52.) Plaintiffs further allege that FlightSafety negligently performed

_____

[6]To be clear, New York recognizes three exceptions to the general rule that the existence of a contractual obligation does not give rise to liability to a non-contracting third-party: "[1] where the contracting party fails to exercise reasonable care in the performance of his or her duties and thereby launches a force or instrument of harm; [2] where plaintiff detrimentally relies on the continued performance of the contracting party's duties; and [3] 'where the contracting party has entirely displaced the other party's duty to maintain the premises safely.'" Roosevelt v. Accelinear Co., 15 A.D.3d 937, 938 (4th Dep't 2005) (quoting Espinal, 98 N.Y.2d at 140).

14

while discharging its contractual obligations and thereby created or exacerbated a dangerous condition. (Johnston Complaint, ¶¶ 50, 51.) In addition, Plaintiffs allege that FlightSafety's negligence in performing the contracts it had with Colgan, Pinnacle, and/or Continental, "launched a force and/or instrument of harm and was a proximate cause of the fatal crash." (Johnston Complaint, ¶ 53.)

Despite these straightforward allegations, Defendants argue that Plaintiffs fail to state a claim for negligent performance of a contractual duty because they allege nonfeasance, not malfeasance. In other words, Plaintiffs allege failure to train, not incorrect training. Although this distinction appears inconsistent with H.R. Moch Co., where the court's focus was on whether an instrument or force of harm was launched, no matter the cause, see H.R. Moch Co., 247 N.Y. at 167-68, Plaintiffs' complaints cannot, in any event, be read so narrowly, particularly at this stage. See Ecology & Env't, 2001 WL 1117160, at *5 (finding that the court must consider New York's liberal pleading rules in determining whether the complaint states a claim).

For example, Plaintiffs allege that Renslow and Shaw's training was improper, which can be broadly construed as alleging that FlightSafety affirmatively provided incorrect training, as opposed to an absence of training. (Johnston Complaint, ¶ 28.) Moreover, Plaintiffs' allegations that FlightSafety provided insufficient and substandard training can reasonably be construed as affirmative conduct or malfeasance, particularly when viewed together with Plaintiffs' further allegations that FlightSafety's financial concerns negatively affected the training it provided. (Johnston Complaint, ¶¶ 28, 40.)

Put simply, Plaintiffs sufficiently allege — whether the result of FlightSafety's malfeasance or nonfeasance — that FlightSafety launched a force or instrument of harm

15

in the form of untrained or incorrectly trained airmen. At the very least, these allegations state a colorable claim under New York law. Consequently, Plaintiffs have stated at least one state law claim against a non-diverse defendant.

. . .

Defendants have failed to establish that Plaintiffs fraudulently joined FlightSafety as a defendant. Because FlightSafety and Plaintiffs are citizens of New York, complete diversity is absent and this Court therefore lacks subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Accordingly, removal on this basis is not permitted.

## C.      Federal-Question Jurisdiction

In the absence of diversity jurisdiction, "the propriety of removal turns on whether the case falls within the original 'federal question' jurisdiction of the United States district courts." <u>Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.</u>, 463 U.S. 1, 8, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). District courts have original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Thus, a civil action filed in state court may be removed to a federal court if it asserts claims "arising under" federal law. <u>See</u> 28 U.S.C. § 1441(b).

A claim arises under federal law if "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." <u>Franchise Tax</u>, 463 U.S. at 27-28; <u>Empire Healthchoice Assurance, Inc. v. McVeigh</u>, 547 U.S. 677, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006) (reiterating <u>Franchise Tax</u> standard). Importantly, it is the plaintiff's complaint that determines whether the case arises under federal law: "federal jurisdiction

exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); Franchise Tax, 463 U.S. at 10; Taylor v. Anderson, 234 U.S. 74, 75-76, 34 S.Ct. 724, 58 L.Ed. 1218 (1914). "[A] right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action." Gully v. First Nat'l Bank, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936). This preserves the plaintiff's role as "master of the complaint, free to avoid federal jurisdiction by pleading only state claims even where a federal claim is also available." Marcus v. AT&T Corp., 138 F.3d 46, 52 (2d Cir. 1998).

Consequently, the existence or assertion of a federal defense does not give rise to federal-question jurisdiction. See Aetna Health Inc. v. Davila, 542 U.S. 200, 207, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004); City of Rome, N.Y. v. Verizon Commc'ns Inc., 362 F.3d 168, 175 (2d Cir. 2004). "[A] defense that relies on the preclusive effect of a prior federal judgment, or the pre-emptive effect of a federal statute, will not provide a basis for removal." Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003) (citations omitted). Neither do federal defenses anticipated in a plaintiff's complaint support federal-question jurisdiction. See Vaden v. Discover Bank, __ U.S. __, 129 S.Ct. 1262, 1272, __ L.Ed.2d __ (2009). Moreover, "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 813, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). A case is therefore generally not removable unless the complaint itself affirmatively alleges a federal claim. Beneficial Nat'l Bank, 539 U.S. at 6.

But the United States Supreme Court recognizes two exceptions to this well-

pleaded-complaint rule. First, a complaint alleging state claims may be removed if Congress expressly provides for removal. Id. at 8; see also Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Second, a complaint alleging state claims may be removed "when a federal statute wholly displaces the state-law cause of action through complete preemption." Beneficial Nat'l Bank, 539 U.S. at 8; see also Avco Corp. v. Machinists, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968).

Here, Congress has not expressly provided for the removal of Plaintiffs' claims. Defendants argue, rather, that Plaintiffs' state claims are completely preempted by two federal statutes: the Federal Aviation Act of 1958 (the "FAA") and the Airline Deregulation Act of 1978 (the "ADA"), 49 U.S.C. §§ 40101, et seq.

Complete preemption exists "when [a] federal statute completely pre-empts the state-law cause of action." Beneficial Nat'l Bank, 539 U.S. at 8. This occurs when Congress "clearly manifest[s] an intent" to so completely preempt a particular area that any civil complaint raising this select group of claims is necessarily federal in character and therefore removable. Metro. Life, 481 U.S. at 63-64, 66. Stated another way, when "federal common or statutory law so utterly dominates a preempted field that all claims brought within that field necessarily arise under federal law, a complaint purporting to raise state law claims in that field actually raises federal claims." Marcus v. AT&T Corp., 138 F.3d 46, 53 (2d Cir. 1998).

Complete preemption exists only "'where Congress has clearly manifested an intent to disallow state law claims in a particular field' and there is a 'clear statement to that effect by Congress.'" Sorrentino v. Allied Van Lines, Inc., 2002 WL 32107610, at *1 (D.Conn. Mar. 22, 2002) (quoting Marcus, 138 F.3d at 54-55.) In the Second Circuit, complete

preemption is understood to extend to "any federal statute that both preempts state law and substitutes a federal remedy for that law, thereby creating an exclusive federal cause of action." Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004). In short, the inquiry is whether a federal statute provides the "exclusive cause of action" for the asserted state-law claim. See Sullivan v. Am. Airlines, Inc., 424 F.3d 267, 275 (2d Cir. 2005) (citing Beneficial Nat'l Bank, 539 U.S. at 9).

Defendants argue that the doctrine of field preemption applies and gives rise to federal jurisdiction, because federal law provides the standard of care against which Plaintiffs' claims concerning pilot training will be judged.[7] The vast majority of the cases they rely on and principles they espouse relate to field preemption. They summarize their position as follows: "Defendants do not contend that State law remedies or general tort claims are preempted by the [FAA], or that the [FAA] provides an independent cause of action; rather, Defendants' [sic] maintain that federal standards of care preempt State standards applicable to Plaintiffs' claims." (Defendants' Memorandum of Law, Docket No. 238, at p. 15 n.10.) This is both a classic expression of field preemption and a concession that complete preemption does not exist.

Field preemption, which is a form of conflict preemption, see English v. Gen. Elec. Co., 496 U.S. 72, 79-80, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), "is inferred in cases where federal law is so pervasive that it leaves 'no room for supplementary state regulation' — where the federal law has fully occupied the field of regulation," U.S. Smokeless

---

[7]Being briefed at this time is Defendants' separate motion for the application of a federal standard of care to all of the cases involved in the multidistrict litigation, wherein they also assert their field preemption arguments. See Docket No. 486. Nothing herein is intended to or should be construed as this Court expressing an opinion on the merits of that motion. This Court's discussion of Defendants' field preemption arguments is limited solely to whether they form a basis for removal jurisdiction.

Tobacco Mfg. Co., LLC v. City of N.Y., 703 F. Supp. 2d 329, 335 (S.D.N.Y. 2010) (quoting

Hillsborough County, Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct.

2371, 85 L.Ed.2d 714 (1985)).  It is found where "the pervasiveness of the federal

regulation precludes supplementation by the States, where the federal interest in the field

is sufficiently dominant, or where 'the object sought to be obtained by the federal law and

the character of obligations imposed by it . . . reveal the same purpose." Air Transp. Ass'n

of Am., Inc. v. Cuomo, 520 F.3d 218, 220-21 (2d Cir. 2008) (quoting Schneidewind v. ANR

Pipeline Co., 485 U.S. 293, 300, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988), in turn quoting

Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

But field preemption is not complete preemption.  Complete preemption gives rise

to federal-question jurisdiction; field preemption does not.  The Second Circuit has noted

that this distinction is a source of some confusion:

> Some commentators seem to equate the defense of field
> preemption, which defeats a plaintiff's state-law claim because
> federal law "occupies the field" within which the state-law claim
> falls, with the doctrine of complete preemption, which creates
> federal subject-matter jurisdiction over preempted state-law
> claims.  But no Supreme Court case has ever held the two
> forms of preemption to be equivalent.  It is true that the
> defense of field preemption and the doctrine of complete
> preemption both rest on the breadth, in some crude sense, of
> a federal statute's preemptive force.   The two types of
> preemption are, however, better considered distinct.

Sullivan, 424 F.3d at 273 n.7.

Defendants' field preemption arguments therefore miss the mark.  It is well settled

that "a case may not be removed to federal court on the basis of a federal defense,

*including the defense of pre-emption*, even if the defense is anticipated in the plaintiff's

complaint, and even if both parties concede that the federal defense is the only question

truly at issue." <u>Caterpillar</u>, 482 U.S. at 393 (emphasis added). Moreover, "a suit seeking recovery under state law is not transformed into a suit 'arising under' federal law merely because, to resolve it, the court may need to interpret federal law. <u>Sullivan</u>, 424 F.3d at 271 (citing <u>Gully</u>, 299 U.S. at 115).

For complete preemption to apply, Defendants must establish that the federal law at issue — here the FAA and ADA — has such an extraordinary preemptive force that it transforms all state law causes of action falling within its reach into federal claims. <u>See</u> <u>Metro Life.</u>, 481 U.S. at 65. So rare is this circumstance that the United States Supreme Court has found it only three times: in § 301 of the Labor-Management Relations Act; § 502 (a) of the Employee Retirement Income Security Act; and §§ 85 and 86 of the National Bank Act. <u>See</u> <u>Domnister v. Exclusive Ambulette, Inc.</u>, 607 F.3d 84, 89 n.2 (2d Cir. 2010); <u>see also</u> <u>Sullivan</u>, 424 F.3d at 272. Not only have Defendants not met their burden, they actually concede that complete preemption does not exist. (Defendants' Memorandum of Law, Docket No. 238, at p. 15 n.10; Defendants' Sur-Reply, Docket No. 306 ("Defendants do not contend that State law remedies or general tort claims are preempted by the [FAA], or that the [FAA] provides an independent cause of action.")

With this concession — both implied in Defendants' lack of argument concerning complete preemption and explicit in Defendants' articulation of its position — this Court need not determine whether the FAA or ADA has complete preemptive effect. Defendants simply do not advance that position.[8]

---

[8]This Court notes, however, that no court has found that the FAA or ADA has complete preemptive effect, and in fact, the FAA contains a savings clause providing that "a remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120 (c). The FAA expressly preempts only state law relating to "price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). In addition, Congress declined to extend original federal jurisdiction to aviation cases involving fewer than 75

. . .

Defendants have failed to establish that federal law completely preempts Plaintiffs' state law causes of action. This Court therefore lacks subject-matter jurisdiction under 28 U.S.C. § 1331. Removal on this basis is therefore not permitted.

**D.    Attorney Fees and Costs**

Plaintiffs seek attorney fees and costs from Defendants for removing these cases in the absence of federal subject-matter jurisdiction, which Plaintiffs maintain is an abuse of the removal procedure. By statute, a court is permitted to award attorney fees and costs when it remands a case to state court. 28 U.S.C. § 1447(c) ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.") It may do so, however, only "where the removing party lacked an objectively reasonable basis for seeking removal." Martin v. Franklin Capital Corp., 546 U.S. 132, 141, 126 S.Ct. 704, 163 L.Ed.2d 547 (2005).

It cannot be said that Defendants lacked an objectively reasonable basis for removal. Although unpersuasive, it is not objectively unreasonable for Defendants to argue that federal jurisdiction exists over this aviation case, and nothing suggests (and Plaintiffs do not argue) that Defendants' removal of the case was done in bad faith, for purposes of delay, or to burden Plaintiffs with litigation costs. Accordingly, Plaintiffs' request for attorney fees and costs will be denied.

## IV.  CONCLUSION

Because Defendants have failed to establish the existence of federal subject-matter

---

decedents in the Multiparty Multiforum Jurisdiction Act, 28 U.S.C. § 1369. All of this would point to the conclusion that Congress does not intend complete preemption.

jurisdiction, remand of these five actions to state court is required. 28 U.S.C. § 1447 (c);

See Franchise Tax, 463 U.S. at 8. Plaintiffs' motions seeking remand will therefore be

granted. Their requests for attorney fees and costs will be denied.

## V.  ORDERS

IT HEREBY IS ORDERED, that the Plaintiffs' Motions to Remand (Docket Nos. 191,

207[9]) are GRANTED in part and DENIED in part, consistent with this decision.

FURTHER, that the Clerk of the Court is directed to transfer cases 09-CV-1039S,

09-CV-1040S, 09-CV-1041S, 09-CV-1042S, and 09-CV-1087S, to the New York State

Supreme Court, County of Erie.

FURTHER, that the Clerk of the Court is directed to close the above-referenced

cases upon transfer to the New York State Supreme Court, County of Erie.

SO ORDERED.


Dated: December 12, 2010
     Buffalo, New York

                        /s/William M. Skretny
                        WILLIAM M. SKRETNY
                        Chief Judge
                        United States District Court

---

[9]The docket numbers of the motions in the individual cases are as follows: 09-CV-1039S (22); 09-CV-1040S (19); 09-CV-1041S (19); 09-CV-1042 (18); 09-CV-1087S (15).